## KANSAS CITY STRUCTURAL STEEL CO. et al. v. YARBER et al.

No. 22505. Opinion Filed Nov. 17, 1931.

Roy V. Lewis and Miley, Hoffman, Williams & France, for petitioners.

Fred A. Graybill, for respondents.

RILEY, J. We are called upon in this case to review an award of the State Industrial Commission in favor of respondent, T. C. Yarber, herein referred to as claimant,

and against petitioner, Kansas City Structural Steel Company, employer, and Globe Indemnity Company, insurance carrier, herein referred to as petitioners. The award is for compensation at $15.39, per week for 34 weeks and three days from August 26, 1930, the date of the injury, less the five-day waiting period, to April 30, 1931, or a total of $530.95, and that the payments be continued at the same rate until compensation for the total period of 500 weeks has been paid.

The findings are that claimant sustained an accidental injury by which he was rendered totally disabled for the performance of ordinary manual labor, and that:

"Claimant is entitled to compensation for the period from the date he was injured, less the five-day waiting period, to April 30, 1931, being a total period of 34 weeks and 3 days, at the rate of $15.39 per week, or $530.95, for the permanent total disability above set out, being more particularly described as total loss of vision in the right eye and industrially blind in the left eye, and for continuing compensation until the compensation has been paid for the whole period of 500 weeks."

The contention of petitioner is: (1) That the findings of the State Industrial Commission are without competent evidence to support them; (2) that the award and findings are not supported by the evidence; (3) that the award is contrary to law.

The record discloses that on and prior to August 26, 1930, claimant was employed by the Kansas City Structural Steel Company, conceded to be within and covered by the Workmen's Compensation Law; that on August 26, 1930, while engaged in striking rivets in a steel tank with a hammer, on or two small particles of steel became lodged in claimant's right eye; he went to a physician in Seminole, who removed one small particle of steel from his eye. He remained under his care for about a week, and was then sent to a specialist in Tulsa, Okla., and was examined and treated by Drs. White & White. Dr. Peter Cope White, of said firm, removed another small particle of steel from claimant's right eye. He was treated there some four months, or until about December 31, 1930, at which time he had entirely lost the sight in his right eye and was practically blind in the left eye.

It is not claimed that he received any direct accidental injury to his left eye. From September 6th to 26th, tests made from time to time showed normal vision of the left eye, although the firm test made on September 4th showed 16 4/10 loss of vision in that eye. The test made on the same day revealed 80 per cent. loss of vision in the right eye. About October 3rd a test revealed about 80 per cent. loss of vision in the left eye, and thereafter until about December 31st, tests made from time to time showed loss of vision in the left eye varying from 80 per cent. to 93 per cent. cent.

About October 6th, because claimant complained of pain in the eyeball, which did not appear to be due to any traumatic condition, and because of inability to dilate the pupil of the eye to any extent, a laboratory test was made. The Wasserman blood test made at that time showed 100 per cent. positive, indicating a systemic syphilitic condition of long standing.

The contention of petitioners before the Commission was that the loss of vision in both eyes was due to the syphilitic condition entirely and was not attributable in any degree to accidental injury. Such is their contention here as to the left eye. No serious contention is here made that the accidental injury did not in some degree accelerate the existing syphilitic condition and contribute to some extent to the loss of the vision of the right eye. Petitioners say in their brief that there may be some possible ground for awarding compensation for the loss of the right eye, although they contend that such conclusion is not reasonably justified by the evidence. This court cannot weigh the evidence. As to questions of fact, the weight of the evidence is for the Industrial Commission to determine. There is some evidence reasonably tending to support the award as to the loss of the right eye.

The uncontradicted evidence shows no accidental traumatic injury to the left eye. We are to determine whether there is any competent evidence to support the award in so far as the loss of the left eye is involved. The cause of the loss of the left eye is a question to be determined from medical or expert testimony alone. It must be attributable to one of two causes. First: The blood condition of claimant due to syphilis, or as one of the witnesses put it: "A syphilitic iritis in both eyes and a syphilitic corea neuro reconilis in both eyes, that in more understandable English would be a syphilitic inflammation of the shutter of both eyes and a syphilitic condition of the retina and optic nerve of both eyes." The syphilitic condition is also referred to in the testimony as "systemic condition." The only other possible cause is what is termed a

sympathetic condition arising from the accidental injury to the right eye called "sympathetic ophthalmia."

Three medical or expert witnesses testified, one for claimant and two for petitioners. Dr. Daniel W. White and Dr. Peter Cope White, both of Tulsa, testified for petitioners, and their testimony is positive and unequivocal to the effect that the loss of the left eye was due wholly to the syphilitic or systemic condition of claimant, and they were both quite positive that there was no sympathetic ophthalmia or sympathetic inflammation. The reasons for their conclusions are stated in their testimony. The award as made, in so far as it applies to the left eye, is wholly without support so far as the testimony of these two experts is concerned.

We must then look to the testimony of Dr. Braswell, who testified for claimant. A careful examination thereof forces us to the conclusion that there is nothing therein from which it can be reasonably inferred that the loss of the left eye was due in any degree to the accidental injury. Dr. Braswell, in his testimony, when called upon to give his opinion or conclusion as to whether claimant's loss of sight was due or attributable in any degree to the accidental injury, always qualified his answers in such a way as to say that such might have been the case in the absence of a systemic or syphilitic condition. As to the right eye he testified:

"Q. Doctor, would the condition in his right eye be attributable to any injury sustained? A. The right eye could have resulted from an injury. Q. Taking into consideration that the man received an injury to the right eye by a piece of steel being imbedded in that right eye, and having no improvement thereafter, and the further fact that his vision was positive previous to the accident. * * * (continued) would it not be reasonable to presume that the impairment was due to the accident he sustained on August 26, 1930, unless there was something specific to the contrary? A. If there was nothing to the contrary. By the Court: Q. You never found it? A. There was a report in the laboratory—a laboratory test made, and I think there was a positive blood Wasserman. Q. Was there any evidence of systemic trouble—any evidence of syphilis? A. I think not—there was no luetic evidence. By Mr. Graybill: Q. At the time you examined him there was no evidence of syphilis causing it? A. I would not say it is attributable to syphilis."

But on cross-examination he admitted that he did not make a blood test or any other scientific test to determine whether or not there was any systemic luetic infection or condition. He admitted, however, that he knew a Wasserman blood test had been made, and that it showed positive, indicating existence of syphilis. While he did not say that in his opinion the condition of the right eye was attributable to syphilis, he did not say it was not. In other words, his testimony was, in effect, that he did not know and had no opinion as to whether or not the condition of the right eye was due to accidental injury or to syphilis; that he did not know whether or not claimant was afflicted with syphilis for the reason he had made no test to determine that question.

As to the left eye he testified:

"Q. Doctor, considering the fact that his left eye was good prior to the time this injury was sustained, and taking into consideration the condition it was in when you first examined him and the condition it has been in ever since, is there reason to suppose that a sympathetic condition could have caused it? A. Could have caused it. Q. Sympathetic condition from the right eye? A. It could have caused it. Q. In the absence of any other cause for this condition, and you found no other cause, the conclusion would be that the injury was the cause of his trouble? A. The only one debatable point would be his blood Wasserman. Q. You found no evidence of that? A. There was none I found."

And upon cross-examination he testified as follows:

"Q. Doctor, you stated you could find no evidence of a syphilitic condition upon your examination—I'll ask you, Doctor, if you made an examination for a syphilitic condition, to determine whether or not he had it? A. There was a report from one of the laboratories in this building. Q. But you testified you could find no syphilis? A. I made the statement that it was positive. Q. But you yourself could find no evidence of a syphilitic condition at that time? A. I did not see any. Q. You did not see any—if you made that statement at that time and that test was positive, you would have to admit that said condition was existing at the time you examined him? A. If there was any presence of syphilis? Q. Yes. A. Certainly. Q. If this man had that condition existing that could have caused this condition from which he was suffering at the time you made this examination, his last treatment? A. His eye findings would have showed luetic symptoms. Q. But did they have that? A. It would from a systemic standpoint."

And when examined by the Commissioner he testified as follows:

"Q. But it is reasonable to believe that

from the history given you by the claimant, laboratory findings, examination and treatments, that the disability he is now suffering with is due to this alleged injury, is that correct? A. [With the history of the whole thing, without any luetic involvement, would certainly give you the grounds for assuming that."

In connection with the testimony of Dr. Braswell it is well to state that the word "luetic" is defined as "pertaining to, or afflicted with lues." The word "lues" is defined: "(a) Any pestilential disease. (b) Syphilis."

So the testimony of Dr. Braswell, so far as the left eye is concerned, is that it might be assumed that the loss of sight was due to the accidental injury, that is, sympathetic ophthalmia, only in the absence of systemic luetic involvement, or, in other words, in the absence of syphilis. He admits knowledge of the laboratory test positively showing the existence of syphilis. Therefore he expresses no opinion whatever that the loss of the left eye was due to sympathetic conditions or was in any way connected with the accidental injury.

There is, then, no evidence whatever to support the finding of the Commission as to the loss of the left eye. It is only upon evidence tending to show that the accidental injury to the right eye might have excited, and probably did excite, or set up more actively, existing syphilis, that the award can be upheld as to the loss of the right eye. Strict construction of the Workmen's Compensation Law would require that compensation even as to the right eye be limited to that percentage of the loss which could be traced or attributed to the accidental injury, leaving the claimant without compensation for that part of the loss attributable to pre-existing systemic conditions. But the law will not make these fine distinctions. Besides, it would be difficult indeed, if not impossible, in most cases to prove the percentage of loss due to each cause. By a more liberal construction or application of the Compensation Law, compensation is awarded for not only the loss attributable directly to the injury itself, but also for disability occasioned by reason of accidental injury exciting to virulence or activity dormant systemic conditions or theretofore unknown or latent diseases.

Unfortunate indeed is the laborer who, in order to provide the necessities of life for himself and those dependent upon his labor, engages in an occupation which exposes him to the danger of contracting diseases peculiar to the particular occupation, known as occupational diseases, and contracts that disease and thereby becomes permanently totally disabled from performing labor of any kind. He and his family may become charges upon public charity. The Workman's Compensation Law is not applicable, and he can obtain no benefits therefrom.

Equally unfortunate is the laborer who, through his own folly, or under circumstances beyond his control, contracts a social disease which when not properly treated or arrested eventually totally disables him from performing labor of any kind. The Workmen's Compensation Law cannot be made to apply in his case. It may be applied in so far as accidental injury augments, excites to virulence, or accelerates the ravages of the social disease, but it may not be applied so as to give relief occasioned wholly apart from and not attributable to some accidental injury received in the course of any growing out of such employment.

The award in the instant case is for permanent total disability, "more particularly described as total loss of vision of the right eye and industrially blind in the left eye." The loss of both eyes, in the absence of conclusive proof to the contrary, constitutes total disability. But the loss of one eye is a specific injury for which compensation is payable at the rate of 66 2/3 per cent. of the average weekly wages (in this case $15.39) per week for a period of 100 weeks, regardless of the extent of disability occasioned thereby. The total amount that can be awarded under the evidence in this case is 100 weeks for the loss of one eye, and $15.39 per week for temporary total disability during what is usually termed the healing period, which means during the time claimant is actually disabled on account of the injury until the injury is healed, or until such time as it is determined that the loss of the eye is complete and permanent. In this case the evidence discloses that the loss of the right eye was complete and permanent on December 31, 1930. Benefits provided for in section 7288, C. O. S. 1921, as amended by section 5, ch. 61, S. L. 1923, are also payable.

It is stipulated in the record that compensation has been paid at the rate of $15.39 per week up until December 29, 1930. It was therefore error to award compensation from date of the injury less five-day waiting period to the date of the hearing without allowance for the amount already paid.

The Commission also made finding "that

$1,000 is a fair and reasonable attorney fee in this connection."

There is no showing in the record of any agreement between claimant and his attorney relative to the fee being submitted to the Commission for its approval, but if such agreement is on file and approved by the Commission, owing to the fact that the award must be modified and reduced materially, we deem it essential that this finding and approval as to attorney's fee should be vacated in order that the matter may be adjusted in connection with the award as modified.

The findings and award of the Commission are reversed and the cause remanded, with directions to award compensation not in excess of the amount indicated herein, and in accord with the stipulations entered into, and with the further directions to strike the findings with reference to the attorney fee.

LESTER, C. J., and HEFNER, CULLISON, and SWINDALL, JJ., concur. KORNEGAY, J., concurs in conclusion. CLARK, V. C. J., and McNEILL, J., dissent. ANDREWS, J., absent.

---

CLARK, V. C. J. (dissenting). The majority opinion finds there is no competent evidence to support the award as to respondent, T. C. Yarber, for the loss of both eyes, but finds there was competent evidence to support the award for loss of one eye. The admitted facts in this case are contrary to the findings of the majority opinion. The following stipulation was entered into by the parties before the Industrial Commission:

"It is hereby stipulated and agreed by and between the parties hereto that the liability for this accident is admitted and that the only question before the Commission is the extent of the disability."

By this stipulation it was admitted before any testimony was taken in this case that the only question before the Commission was the extent of disability. Only four witnesses testified before the Commission.

The respondent, Yarber, and three doctors all testified that respondent had lost both eyes and was practically blind; however, if the stipulation is not binding on this court or the Industrial Commission and cannot be considered as a part of the record, then the preponderance of the testimony is in favor of the award: the undisputed and the unquestioned testimony will support the award.

The respondent, Yarber, was called as a witness and testified that he was working for petitioners on August 26, 1930; that he sustained an accidental injury on that date; that he was given medical attention by petitioners and was later sent to Drs. White & White at Tulsa, Okla., for treatment. He testified as follows:

"Q. Did he send you to any other doctor for treatment after that? A. Yes, sir. Q. Who? A. I was told I had to go into Tulsa or some town where I could get a doctor and · he treated me—White & White. Q. Who treated you, White & White? A. Yes, sir. Q. You submitted to treatment by Doctors White & White? A. Yes, sir; I went to Dr. White & White and Dr. White taken a piece of steel out of my eye—it was the second day. Q. How long did they treat you? A. Four months. Q. Did they treat you until December 29, 1930? A. They treated me until the 27th, the best I remember, that was on Saturday. Q. Did they then release you? A. Yes, he said: 'I have done all I can do.' Q. Were your eyes all right before you were injured? A. Absolutely. Q. Ever have any trouble with your eyes before? A. No, sir. Q. Ever have an injury to them? A. No, sir. Q. Have you been able to work since you were injured? A. No, sir. Q. Are you able to work at this time? A. No, sir. Q. Why? A. I couldn't see how to work. Q. Take off your glasses so the Commissioner can look at your eyes. By the Court: Q. Both eyes involved? A. Yes."

Here the testimony shows an able-bodied man able to perform manual labor who had not had any trouble with his eyes prior to the accidental injury which resulted in total blindness of respondent herein. On cross-examination the respondent testified as follows:

"Q. This injury was a piece of steel to your right eye, was it not? A. Yes, sir. Q. This had got imbedded in the right eye? A. Yes, sir, the steel went in my eye right by the eyesight."

Dr. James Braswell, called as a witness, testified for respondent that he examined respondent on November 24, 1930. His testimony in part is as follows:

"Q. Are you acquainted with T. C. Yarber, claimant in this case? A. I examined a patient by that name. Q. When did you examine him first? A. On November 24, 1930. Q. At that time what was his condition? A. The right eye: Vision, light reception. The pupil was dilated and did not react to light or accommodation. There was a small scar on the cornea. One point marked by seven—of nerve head—had the appearance of an optic neuritis. The left eye: Counts fingers at five feet. Pupil partially dilated. Does not react to light or accommodation. Some (——) of the nerve

head at that time I suggested it might be due to the presence of a foreign body but a report from the radiologist stated no evidence of a metallic foreign body capable of causing (——) in either eye. * * * Q. What is percentage of loss of vision? A. Total in the right eye—he can count fingers at five feet with the left eye. Q. What would you call that? A. Greater than 22/100. Q. Reduced to per cent., what would it be, Snelling? A. Total loss of vision. Q. The same as industrial eye? A. Yes. *. * * Q. Was there any evidence of systemic trouble—any evidence of syphilis? A. I think not—there was no luetic (meaning evidence of syphilis) evidence. Q. At the time you examined him there was no evidence of syphilis causing it? A. I would not say it is attributable to syphilis. Q. Doctor, considering the fact that his left eye was good prior to the time this injury was sustained, and taking into consideration the condition it was in when you first examined him and the condition it has been in ever since, is there reason to suppose that a sympathetic condition could have caused it? A. Could have caused it. Q. Sympathetic condition from the right eye? A. It could have caused it. Q. In the absence of any other cause for this condition, and you found no other cause, the conclusion would be that the injury was the cause of his trouble? A. The only one debatable point would be his blood Wasserman. Q. You found no evidence of that? A. There was none I found."

On cross-examination Dr. Braswell further testified:

"Q. But you testified you could find no syphilis? A. I made the statement that it was positive. Q. But you yourself could find no evidence of a syphilitic condition at that time? A. I did not see any. Q. You did not see any—if you made that statement at that time and that test was positive, you would have to admit that said condition was existing at the time you examined him? A. If there was any presence of syphilis? Q. Yes. A. Certainly. Q. If this man had that condition existing that could have caused this condition from which he was suffering at the time you made this examination, his last treatment? A. His eye findings would have showed luetic symptoms. * * * Q. Doctor, how long would it take for a condition such as you found upon examination in November following the accident in August to develop? A. It might develop in a very short time or it might require a period of days or weeks. Q. You say it might occur in a very short time? A. It may occur in a very few days. Q. Would all that involvement exist in a very few days if it is to both eyes? A. It could. Q. It isn't probable that it would? A. It would depend upon the patient and the conditions. Q. What do you mean by that? A. Sympa-

thetic ophthalmia travels very rapidly and spreads very rapidly. Q. About what period would you say it took it to involve? A. It would be impossible to state—each case is a case unto itself? * * * I wouldn't be governed by the laboratory test in this case—I think his spinal fluid should be examined to determine whether he has a neuroform of syphilis or whether it is—stage. If it is, he should have treatment along this line."

On re-cross examination Dr. Braswell further testified as follows:

"Q. Now doctor, this systemic condition which you spoke of is due to the condition existing from the nerve back down to the branch where the nerve divides, is it not —that is, where it breaks off and goes to each eye and goes back down the trunk and affects the nerves extending to the other eye—that's the systemic condition. A. The systemic condition prevails. * * * Q. Then, Doctor, if he had sustained only an injury to the right eye and it brought about an aggravation of the syphilitic condition existing and extended it to the other eye, would you say it was a syphilitic condition that extended to the other eye or would you say it was a sympathetic trouble? A. I would not say it was a syphilitic condition at the time I examined him. Q. Would you say it was not? A. I would say it was not."

Here the testimony of Dr. Braswell is positive and convincing that the condition of respondent's eyes was not due to disease, but was due to the injury to the right eye and sympathetic condition, that is, the nerve in the injured eye died back to where it forked and that killed the nerve in the other eye is positive proof that blindness was not due to disease.

Dr. Braswell further testified on redirect examination as follows:

"Q. Doctor, have you been paid your bill for treatment of this man? A. No, sir. Q. Is there any other treatment recommended? A. I think the boy should be under the observation. He is practically blind."

I am of the opinion, under the statutes, the award should have been affirmed, for the reason the testimony above quoted is competent, unimpeached and reasonable and supports the award.

Dr. Daniel W. White, called for petitioners, testified that he had treated the respondent and it is from this testimony that the majority opinion finds that it was disease that caused the blindness of this man in one eye and that the respondent was suffering from syphilis.

Dr. White testified as follows:

"Q. We decided to have a Wasserman blood test made. The laboratory made the

blood test and reported 100 per cent. positive Wasserman. * * *"

This testimony of Dr. White is incompetent and has no probative force, for the reason it is hearsay. A Wasserman blood test was made, the laboratory made the blood test and the report is what Dr. White testified about. The report was not offered; but he did not testify who made the blood test, he did not give the name of the parties or the man making the report. Dr. White did not testify of his own knowledge, but on a report he received from some person whose name he did not mention. There is no evidence that the test or the report was made by a competent person. It is hearsay and fails to establish any fact.

The doctor further testified that iritis, a disease of the nerve, caused the blindness. That 50 per cent. of iritis is due to syphilis, and cited his authorities for the statement. There is also evidence in the record and it is admitted by Doctor White that an injury to the eye will cause iritis. The doctor's theory was that 50 per cent. of iritis was caused by syphilis; then, under a liberal construction, the injury being proved positively and the condition of syphilis being very doubtful, it was the duty of the Industrial Commission to find for the respondent for the reason the preponderance of the testimony on this disputed question was in favor of the respondent.

Dr. White further testified that on the 6th day of September, 1930, the vision in respondent's left eye was normal. This testimony corroborates the testimony of Dr. Braswell, that the effects of the injury to the right eye would go back down the nerve to the fork and when it reached the fork it would destroy the nerve to the left eye.

No doubt the effect of the injury on September 6th had not reached this place on the nerve and thereby destroyed the nerve in the left eye. Had the blindness in the left eye been due to syphilis rather than the injury, the syphilis would have affected the eye before September 6th. Throughout the testimony of Dr. White and his brother, he makes light of the injury to the right eye, but admits that the respondent is practically blind.

Respondent further testified as follows:

"Q. Did you ever know you had syphilis until Dr. White told you you had last October, 1930? A. No sir."

Dr. Peter Cope White testified that he was a member of the firm of White & White and his testimony is practically the same as that of his brother, except he testified as follows:

"Q. If a man has had syphilis over a period of time and received a piece of steel in his eye, could not that aggravate it? A. Yes, when you have an inflammation from the steel they always do. Q. All right; now, then, Doctor, wouldn't this steel in the eye light up a condition of a disease he had had? A. It could do that. Q. Well, is it your opinion that this man's injury, this steel getting in the eye, lighted up this diseased condition? A. I answered it could have lighted it up. Q. You don't know whether it did or didn't? A. It could have; frequently a recent trauma will light up a progressive condition."

The record contains a report of the two witnesses, Drs. White & White, made to the Industrial Commission on date, September 15, 1930; said report in part is as follows:

' Give an accurate description of the nature and extent of the injury. A. Imbedded steel in the right cornea.

"Describe treatment. A. Anesthesia, removal of steel from right cornea, after treatment.

"Are symptoms from which he is suffering due entirely to this injury? A. Yes.

"Has the injury resulted in a permanent disability? A. No.

"Has previous sickness or injury contributed to his disability? A. No.

"Is there evidence of syphilis? No.

"Alcoholism? No.

"Occupational disease? No.

"Hypochondriasis? No.

"Exaggeration? No.

"Tubercular infection? No.

"Any infectious disease? No.

"Neurasthenia? No.

"Hysteria? No.

"Is there evidence of malingering? No.

"State in patient's own words how accident occurred.

"While knocking out rivets, a piece of steel flew into my right eye."

I am of the opinion, not only was there competent evidence to support the finding of the Industrial Commission, but that there is no competent evidence to support the finding in the majority opinion that respondent had syphilis. The evidence in support of the finding of the Industrial Commission is clear, convincing, and is sufficient in my judgment, under the well-established rules of this court

that where there is any competent evidence tending to support the finding of the Commission, the order and award of the Commission will be affirmed; however, admitting, which I do not, that respondent was suffering from syphilis, the evidence of all of the doctors is to the effect that the injury would have lighted up and aggravated this condition and resulted in immediate disability, while there is no proof in the record of any character that without the injury respondent would have ever suffered with his eyes.

This court, in the case of Shell Petroleum Corporation v. Moore, 147 Okla. 243, 296 P. 390, in the second paragraph of the syllabus, said:

"Where respondent, having a pre-existing arthritic condition of the back which at some uncertain and undetermined time in the future might cause him to become totally incapacitated, was injured by a heavy piece of lumber falling upon him, resulting in immediate temporary total disability, held, that he was entitled to full compensation for temporary total disability."

The following cases from other jurisdictions are cited with approval in this case, to wit: .

"The Supreme Court of Pennsylvania, in Guyer v. Equitable Gas Co., 123 Atl. 590, in the fifth paragraph of the syllabus, said:

" 'Death from fall rupturing blood vessels, which in turn caused rupture of cyst (a diseased condition of the pancreas), is compensable, though such diseased condition might ultimately have caused death.'

"The Supreme Court of Utah, in the case of Utah-Idaho Central R. Co. v. Industrial Commission of Utah, 267 Pac. 785, in the third paragraph of the syllabus, said:

" 'In case a latent disease or trouble is accelerated or lighted up by an industrial accident, and a more serious injury results by reason of the fact of the existence of such latent ailment than otherwise would have resulted, employee is entitled to additional compensation.'

"The Supreme Court of Illinois, in Sunnyside Mining Co. v. Industrial Commission, 151 N. E. 238, in the third paragraph of the syllabus, held:

" 'Evidence held to show that employee's injury aggravated condition of spine already affected by arthritis, entitling him to compensation for permanent partial disability.'

"In the case of Warlop v. Western Coal & Mining Co., the Circuit Court of Appeals, Eighth Circuit, 24 Fed. (2nd) 926, in the fourth syllabus, said:

"Where coal miner, having a pre-existing arthritic condition of the lower portion of his back which at some uncertain and undetermined time in the future might cause him to become totally incapacitated, was injured by a heavy rock falling upon him, resulting in immediate total and permanent disability, held, that he was entitled to full compensation for permanent and total disability as prescribed by the Kansas Workmen's Compensation Act.'

"At page 930 of the above-cited case, the court said:

" 'It does not appear in this case that, even had the accident not occurred, the disability would, at some certain time within the 8-year limit of the statute, have resulted from any disease. Certainly the disease did not produce the disability of appellant. Did the accident, or was it a combination of the two? The arbitrator and the court found the latter. There are probably lurking germs of disease in nearly all human mortals. Some accident may accelerate the disease and produce complete disability, but, if the disease would not have developed without the accidental injury, that must be regarded as the contributory proximate cause. Workmen's Compensation Acts are not limited in their benefits to perfectly healthy employees. An interesting comment on this phase of the matter is that in Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1818F, 862:

" 'The proof goes no further, in support of the defense of this suit, than to show that the plaintiff might, and perhaps would, at some time, have been disabled by the disease that was lurking in his system, even if the accident complained of had not happened. And that is not much more of a defense than to say that every man must some day come to the end of his worldly career, accident or no accident.'

"The courts very generally hold that if an existing disease is aggravated by accident or injury, compensation must be paid for the resulting incapacity.

"In Blackburn v. Coffeyville Vitrified Brick & Tile Co., 107 Kan. 722, 193 Pac. 351, the court held that the trial court's instructions to the jury that plaintiff could not recover for an aggravation for any disease that he had prior to receiving injury was error, and the court cites with approval a number of leading cases on the subject."

I am of the opinion that the judgment and award of the Industrial Commission should be affirmed.

Note.—See under (1) annotation in 8 A. L. R. 1324; 24 A. L. R. 1466; 67 A. L. R. 802.